The next case on the docket is 513-600 Sheffel Financial Services, Inc. v. Heil. Counselor, may you proceed. Your Honors, Counselor, may it please the Court, my name is Joseph Belazza, and I have been admitted pro hoc. I represent the defendant appellant Stephen Heil, and we are asking the court to overturn the trial court's December 17, 2013 preliminary injunction. Your Honor, this preliminary injunction matter boils down to one very specific, very central issue, and that is whether or not the plaintiff, Sheffel Financial Services, Inc., has the requisite, legitimate business interest to enforce a non-solicitation agreement. Now, Illinois courts articulated what does this mean to have a legitimate business interest, and courts have said that in order to show the legitimate business interest, one of the methods is to show a near permanent customer relationship. Now, if we take a look at the preliminary injunction issued by the trial court, if we look at page 8 of 16. Page what? Page 8 of 16. Yeah. Judge Crowder articulated as follows. Legally, of course, the clients could not be serviced by Sheffel Financial, but had to be assigned a registered representative who is an independent contractor for LPL, which does add a legal wrinkle to the argument. Your Honor, Sheffel Financial Services, in order to provide financial services, would need to be registered, which it is not. As a result, under the Securities Exchange Act of 1934, that's 15 U.S.C. section 780, and under 815 ILCS 5 slash 8 section A, as well as the case law and the SEC no action letters, in order for it as a corporate entity to provide this type of financial services that are at issue in this case, it would have to be registered. And it is undisputed that it is not registered. And Judge Crowder articulated again that legally, of course, the clients could not be serviced by Sheffel Financial. As a result, Sheffel Financial doesn't have customers and it doesn't have customer agreements. It is not permitted to legally even possess the customer's information. As a result, when we attempt to unravel the customer relationship, the business, the commercial relationship, and analyze it in parts and pieces to determine if it is one which can be categorized as near permanent, what we find is that there isn't one. There is no commercial relationship between Sheffel Financial and these clients. Does your argument center around the restrictive covenant at all? It does, Your Honor, absolutely. Because in her order, Judge Crowder finds that particular portion of the contract as not applicable. I'm sorry? She basically says that a portion of that covenant should not be honored. Yes, Your Honor. Right? Yes, and I think that was a, what's colloquially referred to as a non-compete or a non-service provision, and what we have on appeal is the non-solicitation provision, which remains in effect in Judge Crowder's preliminary injunction. Tell us how she got to a near permanent relationship. How these factors even fit. I'm going to jump way ahead. There are two issues that have resulted in a record that's as big as it is. There is a factual series of events that makes this situation, I dare say, a little confusing. There are two corporate entities. One of them is an Illinois corporation, Sheffel Financial Services, Inc. That's the plaintiff in this case. It's not registered. It's not in dispute. There's another corporate entity, LPL Financial LLC. It is the country's fourth largest broker dealer. It's registered. It's scrutinized. It's regulated by the Securities Exchange Commission. It's required to abide by the Securities Exchange Act. It's a member firm of FINRA. It engages and can legally provide financial services. It can legally receive revenue in exchange for providing financial services, unlike Sheffel. Now, historically, coincidentally, two things happened that make this issue money. The first one is Stephen Hyde said to LPL, with whom he is registered, I want to have a DBA name. I want a fictitious name that I can use in my community to market myself. The name he picked for his DBA name happens to also be the name of the corporate entity that's the plaintiff in this case, Sheffel Financial Services, Inc. But if you will, Your Honor, I'm Joseph Amante. I could have a name tag that says I'm Joseph Amante, and I have all the things that come with me, a bar card, the ability to practice law, various things that I've done to abide by my obligations under the rules. If I grab a person off the street who's not an attorney, not me, and I take my name tag off of him and I slap it on this other person and say, now you go off into the world and market yourself as Joseph Amante, that doesn't convert that person into me. They don't get my bar card. They don't get permission to appear in front of courts. There's a whole lot of stuff they can't charge for legal services because they're not a lawyer. Here, my client Stephen Heil said to LPL, give me permission to market myself with a DBA named Sheffel Financial Services. That doesn't mean Sheffel Financial Services, the corporate entity that's the plaintiff in this case. It doesn't make it a financial firm. It doesn't convert it somehow into something which is regulated and supervised and has to abide by securities rules. The second thing that – and I want to take a small detour here with Your Honor's permission, which is this. Their backup argument is that, well, even though we don't – even though there is not a single client agreement in the entire record between Sheffel Financial and a client, even though there's not a single document in the record showing clients paying money in a commercial transaction to Sheffel Financial or Sheffel Financial providing services to a client for compensation, they indirectly get their revenue. And that issue is Sheffel Financial's sort of backup issue. This is our other legitimate business interest. Slow down just a little bit, counsel. I'm having trouble keeping up with you. Slow down your speech a little bit, please. I apologize, and it's worse because you're probably the 30th person that said to say that to me. I'm sorry. To the extent that they receive the revenue, that too is completely and utterly illegal. The Securities and Exchange Act of 1934 says you cannot be a broker-dealer unless you're registered.  So just because it happened doesn't make it a legitimate business interest. Have you reported that? Have you reported Sheffel Financial to the SEC? That's a very complicated question, Your Honor. Well, and, counsel, didn't your client operate under this business agreement for some 10 years with others, and it was all voluntary, and then he voluntarily contracted to enter into certain covenants? I mean, his actions seem to contradict the argument that you just made there. You're absolutely right, Your Honor. He did. He signed the document. He lived in this arrangement that doesn't comply with the securities laws, and that's why we rely on another part of the Securities and Exchange Act, which says that contracts which violate the securities laws are void. And, again, without getting – I mean, there's obviously a deep factual record here. My client, Stephen Heil, had a branch manager named Jeffrey Westerhold, who was an LPL branch manager, had supervisory obligations or responsibilities under the securities laws, who ultimately was telling Stephen Heil, this is fine. This is in accordance with the law. This is how it's supposed to be done. But, ultimately, if you look at the cases that deal with people that end up contracting with unregistered broker-dealers or unregistered entities, they're the victims. And that's why there's 15 U.S.C. 78 C.C. Perens B, a contract which violates securities laws is void. And that is in there to protect the victim. And there are cases where investors have come across people that were engaged in operating an illegal broker-dealer, made investments. Those contracts become void, even though that investor, for a good amount of time, didn't know any of that or they were believing the representations being made there. Does that answer your question, Your Honor?  Returning, Your Honors, to this issue related to revenue. We have provided this court, in our briefing, with citations to the Securities Exchange Act of 1934, with citations to Illinois statutory law, as well as a couple of different cases, as well as the SEC no-action letters. And the reason that we included the SEC no-action letters, and if you would, Your Honors, in this big record, that that's sort of what we believe to be kind of the most telling nugget, because the fact scenarios in those no-action letters are just remarkably similar to the facts in this case. And what they have described is they have said that a broker-dealer, in order to function as a broker-dealer, we look at different behaviors. What behavior can you and can you not engage in? And the behaviors you cannot engage in without being licensed are, they include soliciting securities transactions, holding oneself out as a broker, and receiving transaction-related compensation. To shuffle financial services by not being registered, it can't receive, or it shouldn't be, excuse me, it should not be receiving transaction-related compensation. And if it has, that is absolutely illegal, and it cannot be used to satisfy a legitimate business interest. It should not be holding itself out as a broker, and it should not be soliciting securities transactions. When my client Stephen Hines solicited securities transactions, when he brought custody of client information, he did all of that as a registered representative of LPL. The other issue that adds, this is the second issue that causes the markings, and this goes back, Your Honor, to your question about the contract. And if we take a look at the employment agreement, that document contains recitations in it that are simply not accurate, as confirmed by Judge Crowder when Judge Crowder said that the clients could not be serviced by Shuffle Financial. And some of those recitations are as follows. That Shuffle is a financial services firm, which it is not, in which Judge Crowder said that no, Shuffle could not service these clients. That Mr. Heil's duties for Shuffle will include client development for Shuffle. And in fact, none of these clients that are at issue ever became clients of Shuffle Financial. They only ever had LPL accounts. They only ever signed LPL agreements. They only ever received financial services from LPL registered representatives. Now, there's nothing now, without overcomplicating the matter, there's nothing wrong with Mr. Heil having a relationship with two different corporate entities. But what he does for one corporate entity, LPL, is have clients, service clients, provide financial services. What he does with Shuffle Financial, whatever it may be, it is not the providing of financial services. It's not obtaining clients. It's not servicing clients. And to the extent that what it is, is some aftermarket further split of revenue received from the securities transactions, that should not have been going on. My client should not have been told it was okay for that to be going on, and he should not have been subjected to that. In addition, and lastly, is the issue of the trade secrets. And I want to talk about this a little bit for two reasons. One, to talk about it purely for the purpose of talking about trade secrets, but also to accentuate this issue of a complete and utter lack of a customer relationship. Private client financial information is treated very specially, very uniquely under federal securities laws. The only corporate entity which can exercise ownership of client information is a duly registered broker-dealer. So Shuffle Financial Services, not only does it not own the client information that's at issue in this case, it can't even possess it. To the extent that somebody with a Shuffle Financial Services affiliation walks into a building somewhere and physically obtains a copy set of LPL's client information, they're not supposed to have it. Period. Let alone claim an ownership interest in it, and then sue for a violation for somebody having allegedly taken it being their trade secrets. And that is another aspect of the employment agreement which was clearly at issue. Now, Judge Crowder did in fact find that Mr. Heil was in fact entitled to have the client information that he had taken from LPL in the preliminary injunction.  It's part and parcel of this overarching situation whereby Shuffle Financial Services not only doesn't have a near permanent customer relationship, but doesn't have a customer relationship at all. If Shuffle were not in this lawsuit, nobody would complain about the departure because of the protocol agreements? That's exactly right. Yes, absolutely, Your Honor. So we wouldn't be here but for Shuffle claiming an interest in the property, clients, money, whatever. That's right. The legitimate part, the party interest that actually has client, the only party that can legally receive the revenue, LPL, would not have brought this case, and didn't bring this case because it can. Why do you think Judge Crowder would not rule on the standing issue? She clearly says that she's not prepared to rule that Shuffle cannot be the plaintiff. But it seems to me that if we believe what you say is true, that Shuffle has no standing. That's absolutely right, Your Honor. And I don't quite hesitate to attempt to articulate or put words in the mouth of Judge Crowder. I'm sure she would do a far better job of explaining that than I will. I would suggest that it arrives out of this, if I may be so bold as to use the word masquerade. There are two corporate entities that are very specific. They have different rights. They have different responsibilities. They have different licensing, different registrations. And Shuffle Financial Services, because of this historical coincidence, that Stephen Heil and some others asked LPL, can we please put this branding name tag on it? Shuffle Financial Services has attempted to sort of put this mask on and say, here's a business card that has both Shuffle Financial and LPL on it. Here's a sign in our front window that says Shuffle and LPL. So pretend like we're a registered broker dealer. Pretend like we're the ones servicing these clients. That does not make it fact. That does not make it ultimately legally and factually accurate. It doesn't make it any easier that the name they chose for this LLC is Shuffle Financial Services, Inc. I recognize how crazy that sounds. I say to people, Shuffle Financial Services doesn't provide financial services. And they go, hmm, then why is it called Shuffle Financial Services? Well, type just about any old thing into the Secretary of State's website when you want to create an LLC. I could create an LLC that says Joseph Alonzo Pizza Delivery, and then I could run whatever business out of it I wanted to. Doesn't necessarily mean I'm engaged in pizza delivery. Similarly, just because it's called Shuffle Financial Services, just because this corporate entity exists, and people who are registered and engaging in financial services sales with LPL, just because they're using that phrase as a DBA, it doesn't change things up. As to why Judge Crowder chose not to rule on the standing issue, I don't know the answer to that specifically. I mean, clearly we see that issue as incredibly intertwined with the issues I'm talking about, which is the fact that you can search the entire record, and nowhere in there is there a single, quote, client agreement between Shuffle Financial Services and a client. There's also not a single shred of paper showing a commercial transaction occurring between Shuffle Financial Services for compensation with a client. In fact, all of the testimony was absolutely in agreement that the clients don't pay Shuffle Financial Services for anything. All of that money is paid to LPL. But the wrinkle is that Shuffle claims that HIO is its client, right? I mean, a very intriguing argument. I think, if I may, I think that Shuffle's argument is that it's LPL's business model to treat not investors and the public as customers, but to treat financial advisors as the clients. And where that gets a little bit tricky is the evidence that's presented to you all to justify that worldview are marketing pieces off the website. And that's LPL's business model. You know, we're going to be the friendly place. We're going to serve as financial advisors. We're going to treat you like our client. Under the Securities Exchange Act, the word client, it's got a meaning. It means a public investor who's saying, here's my retirement 401k. Tell me how to invest it. Under the securities laws, registered financial advisors are not the clients of LPL. I mean, when LPL, you know, when you talk about client, we've got to follow money laundering. We've got to weed out terrorist funding. We have to know your client to give them appropriate investment advice. All the use of the word customer and client in that area, in that field, is purely members of the public putting their money with a financial advisor for investment advice. So, again, as it relates to this, who's the customer? Is it the, you know, for lack of a better word, the stock broker, the registered representative, or is it the ultimate investor, the people who Stephen Heil has been prohibited from soliciting? We're just talking right past each other. And then, again, we would say, as it relates to this non-solicitation agreement, you know, when Mr. Heil is told not to solicit, he's not to solicit financial services, a service that Sheffield doesn't even provide. He's told not to solicit securities clients, clients Sheffield doesn't even have. So does it, or let me ask you this. You've got Mr. Heil, who is an independent contractor with LPL, one of several doing business at Sheffield Financial Services, and he voluntarily contracts, entered into an agreement, receives consideration for it, $25,000 is my recollection, to enter into this agreement, which has certain covenants. Maybe this will come up on the rebuttal portion by Mr. Wirth, but you take a crack at that, too. How do you get around that, that he voluntarily contracted to enter into this covenant? This would be a radically different case. You don't have your rebuttal time. Can I take 30 seconds? Go ahead, Nancy. I have 30 seconds. Go ahead. If the contract said, Mr. Heil, we're giving you consideration, in exchange you need to promise not to solicit LPL clients, we'd have a whole other case. Instead, what the contract says is we're giving you consideration, you can't solicit Sheffield clients. If factually Sheffield doesn't have clients, that's the end of the inquiry. Thank you. Thank you, Your Honors. Oh, and if I may, I grew up for a while in Illinois. It's an honor to appear in your court system. Where are you from now? I lived out in Illinois, so we all have our crust to bear. That's why he talked to me. I'm getting rid of that. I thank and please the court, counsel, on behalf of Sheffield Financial Services, and I also have Mr. Yurick and Mr. Westwolf in the courtroom with me today. I appreciate the opportunity to be heard. As you all know, this is a very limited issue that's before you today. The merits of this dispute is certainly not to be decided today. Rather, the only question is whether or not Judge Crowder used her discretion after a five-day evidentiary hearing, thousands of pages of testimony and exhibits, that she abused her discretion and failed to employ conscientious judgment in concluding that Sheffield Financial had raised a fair question under the only non-solicitation law that it had raised a fair question that it was entitled to a plenary injunction to enforce the contractual covenants contained in the employment agreement, in effect, for over 10 years between Sheffield Financial and Mr. Hyde. And so Judge Crowder, in entering a plenary injunction, is simply maintaining the status quo to ensure that additional harm does not continue to occur while she ultimately decides the ultimate legal rights and obligations of the parties, which she will then determine after your decision affirms her plenary injunction and remands the parties back to Judge Crowder's jurisdiction. Excuse me. What is the singular most important question? I'm sorry, most important fact that you have that makes it a fair question that Sheffield is entitled to bring this action? Because the individual relationships between the registered representatives and the employees of Sheffield Financial are the relationship between Mr. Westerhold, Mr. Hyde, Mr. Burns, and the other financial advisors who are employees of Sheffield Financial Services who are interacting, providing the advice and counsel to the individuals, folks such as my parents. They aren't meeting with anyone from LPL. They never talk to anyone from LPL. LPL doesn't refer these individuals to Mr. Westerhold or Mr. Hyde to receive financial services. This is essentially no different than your State Farm agent or your country company agent. They're not an employee of State Farm. They're not an employee of a country company. They are their own insurance, you know, and so they are providing State Farm services through their clients, the individuals who purchase their insurance. No difference than the individuals who receive the advisory services, the brokerage services, or the other financial services that Mr. Westerhold or the other team of employees of Sheffield Financial Services provides. There are two different business models, Your Honor, and one of the things that Judge Crocker cited in her decision was a defender arbitration case involving Fidelity Brokerage. And in that decision, and that's part of the record, it's a lengthy decision. It recognizes that you have what's in the industry referred to as the wirehouse businesses, such as Morgan Stanley, where all the financial representatives are employees of Morgan Stanley. And then you have an independent brokerage model, such as Raymond James. LPL, where they are not employees of LPL, LPL provides the administrative support, provides the regulatory oversight and compliance, but the actual services, should you buy this stock or should you purchase this annuity or should you do these investments, those come from the advice and the counsel of the individual employees of Sheffield and their clients who are going to them for financial advice. And so, in a nutshell, that's why. But doesn't the securities exchange rules require that those clients, quote-unquote, of Sheffield, have to be registered with a firm that is... No, the client does not. The representative they're dealing with has to have a registered relationship with a broker dealer and every owner of Sheffield Financial Services and every employee of Sheffield Financial Services is, in fact, registered, albeit as a limited agent, independent contractor with LPL. But, yes, they have to have an affiliation with a broker dealer, and there's nothing illegal about that business model. Mr. Heil's own expert witness acknowledged that there's nothing illegal about Sheffield Financial Services being a corporation, being affiliated with a broker dealer, and then providing services to the individual clients and running the transactions through, in this case, LPL or Raymond James or any other. I thought the transactions went to Sheffield. I'm sorry? I thought that the transaction, the money, went to Sheffield. After LPL provides, essentially, the services, they maintain the accounts, they send out the statements. So there's $100 of fees generated. LPL takes a 10% service charge for providing all the regulatory support. Ninety percent of the money then flows back to the individual representatives and employees of Sheffield Financial Services. That's the real world. Mr. Arlanto's analysis of the wonderland world, Judge Crowder, after five days, understood the real-world reality of the situation. So, yes, the money has to flow through LPL to the individual representatives who are all individually registered, subject to the federal oversight. Mr. Arlanto wants to make a big deal about these no-action letters. I think I need to reiterate a couple points about those. First of all, those aren't court decisions. That's not a Supreme Court decision. That's not a circuit court decision. That's not a district court decision. It is not even an SEC decision. What it is is an advisory letter from a person in the enforcement staff that said, on these facts, we can't tell you that we wouldn't enforce, wouldn't start an enforcement action. How it will play out, can't predict. The letters specifically say we're not stating any legal conclusions in here. We reserve the right to change these opinions. So those no-action letters are nothing more than an advisory letter from a prosecutor that, you know, we can't tell you we wouldn't prosecute you, or we can't tell you that we wouldn't open an enforcement action. How it turns out only happens after there is an investigation, hearing, and decision. You don't have any of that in the record in the first place. Again, if you go back to reliable fire equipment, the only Supreme Court decision from less than two years ago, and it restates standing on the law, is it's the client relationship, the goodwill that is the protectable interest. And the goodwill here, it's not only a fair question, it's a sole evidence before the rector, was the goodwill between the individual clients was developed between the individual client and the Sheffield employee. To answer your question, Judge, that Mr. Aranco never answered for you, was how did Judge Crowder conclude that there was a near-permanent relationship? Mr. Westphal's testimony was uncontradicted. He went through the 72 clients in dispute. I believe it's Plaintiff Exhibit 20, and he specifically identified how long those clients had been clients of Sheffield Financial Services, and the evidence there was the vast majority of 72 clients – sorry, I need to slow down as well – had been doing business with Sheffield Financial Services for over five years, many going back to the formation of Sheffield Financial back in late 2001, early 2002. That testimony was unrebutted. Mr. Hyland didn't come in and say, oh, no, that's not true. Mr. Hyland did not claim that he had brought any of those 72 clients to Sheffield Financial. Not one of them. The clients that he brought to business, he was free to take with him and solicit. His family members, he was free to take with him. There wasn't a single moment where he was precluded from servicing either those clients or his family members. And so, you know, that is simply a compelling reality. You know, the arbitration rule that Mr. Alonzo kept trying to fool Judge Crowder and said this bans non-solicitation covenants, she's a smart judge. She's been doing this a long time. She's not fooled by any masquerading argument. The specific rule says this does not ban non-solicitation covenants. That's not contrary to the financial service public policy. She got that. Their own expert admitted that that's true. And so the client relationships, that's what is the protectable interest under Illinois law. That rule developed between Mr. Hyland as an employee of Sheffield Financial Services for over 11 years and the individuals who were coming to them for financial advice and services. Clearly, there's no dispute here, you know, Mr. Hyland, despite accepting the $25,000, it's not like he left that behind when he ran out the door on the 30th, despite his obligation to give us two weeks' notice, he accepted the benefits for the non-solicitation covenant. This is not his first time he's been through this. When he left Merrill Lynch back in 2002, he had signed similar restricted covenants in the suit and was forced against them. The day he went over to Morgan Stanley, he signed the same type of restricted covenant with Morgan Stanley as he had signed with Sheffield Financial. But he left there on the morning of the 30th and sent out a comprehensive solicitation packet to all 72 clients. They got this, you know, he rolled the dice, figured we wouldn't be able to get a TRO in time waiting to the Friday of Labor Day. He overnighted all of these by express sounding delivery at considerable cost to get all 72 clients. Why? Because he knew he had major exposure under his non-solicitation covenants. Not a single person was discouraged or dissuaded from filling this out. We couldn't stop that. We didn't stop that. And so, you know, a few people elected to transfer their business. We have a legal claim for damages for those, not an injunctive claim. But the vast majority who received the 36-page solicitation packet chose to remain with Sheffield Financial Service and to continue to receive their investment advice, their financial planning advice from Mr. Westerhold, Mr. Burns, and the team at Sheffield Financial. The other compelling point that undoubtedly motivated Judge Carr to conclude that a preliminary injunction was required, again, she maintained the status quo. She's ensuring that future harm won't occur. You know, the admitted attempt to solicit clients of a near-permanent relationship is presumptively irreparable. But Judge Carr also knew that Mr. Kyle would get a $750,000 bonus payment if he could continue stealing the rest of the clients from Sheffield Financial and bringing them to Morgan Stanley. That's a huge incentive to run past the stop sign of his covenant and to bring these clients away from Sheffield Financial and to Morgan Stanley. Again, and I talked about this in my closing argument for Judge Crowder, you know, Sheffield Financial is not Morgan Stanley. It doesn't have hundreds of thousands of employees. You know, it has three individuals, Mr. Westerhold being one of the principal representatives. You know, each of those folks have families to feed, their own careers to foster. You know, they're as much as dependent on the revenue from the client services as Mr. Kyle wanted to essentially capitalize on and take with him to Morgan Stanley on top of the essentially half-million-dollar signing bonus that he was given by Morgan Stanley based upon his promise that he would take half their business with him. And now, again, so there are certainly significant stakes here that Judge Crowder said, whoa, we're preserving the status quo here, and we're going to sort out all these legal arguments. You know, again, she wrote a 16-page single-space decision after a five-day hearing, you know, again, to say that she didn't exercise any degree of, you know, conscientious judging or didn't have a fair basis in the record for the conclusions she reached, I think, you know, is an insult to all trial judges. The protocol, again, in 2012, the evidence is undisputed that Mr. Kyle asked Sheffield Financial to agree to follow the protocol. He explained it to Mr. Urick and Mr. Westerhold, and they said point blank, that doesn't make any sense for our business. We're not going to follow it. So, you know, again, how strangers can make whatever agreements they want to make amongst themselves, but they can't override the employment agreement between Mr. Hyle and Sheffield Financial Services. And again, you know, the protocol, you know, didn't override the agreement, but even if it did, the protocol recognizes that there's different rules for teams of financial advisors. And Mr. Hyle testified in April of 2002, when Merrill Lynch took his deposition, that I joined a team of investors at Sheffield Financial. Now, granted, in 2002, the team was he and Mr. Westerhold, but he, since day one, knew the team, knew it was different, and even the protocol recognizes that in the context of teams of investors, the general rules don't apply. The team agreements do apply. The evidence was undisputed that every member of the team had the same exact restrictive covenants that applied to them if they were to leave Sheffield Financial like Mr. Hyle did in August. Let me ask you one last question. Judge Crowder says, and you've argued that Sheffield could service its clients.  Just like my state farm agent can sell me insurance products. But your state farm agent is a registered insurance company in the state of Illinois, so it's complied with whatever legal framework there is. Sheffield Financial, you would agree, can never be registered with the Securities and Exchange Commission, right? They are not. They cannot. They could be. As they operate today, could they be? If they wanted to be a broker dealer, they could be. But every individual owner of Sheffield Financial Services, every employee of Sheffield Financial Services is not only registered with the SEC, they are also individually registered with the state of Illinois. Okay. Because they are an independent company, they do not have to be registered to operate as a financial services company within the industry. Okay. Well, Judge Crowder, in her order, says, legally, of course, the clients could not be serviced by Sheffield Financial, but had to be assigned a registered rep who was an independent contractor for LPL, which does add a legal wrinkle to the argument. So she's saying that Sheffield cannot service clients. On its own. But given its affiliation, it absolutely can. Its affiliation with these gentlemen. With LPL or Raymond James or any other number of the independent broker models in the industry, there is nothing unique about this. There's nothing unusual about this. If anything, it is the growing nature of the financial services market, the independent broker dealer registered representative arrangement, versus the large wholesale, you know, I don't need a financial advisor who's more interested in trying to sell me, you know, stock funds in the Ukraine. I'm looking for, you know, how I'm going to, you know, invest my retirement, or as my parents say, how can I make sure there's enough money that I can make it to, you know, the grave. That's where, you know, again, they receive those services from folks at Sheffield Financial. You know, again, the evidence was undisputed. When we looked at the total amount of clients at Sheffield Financial Services and the total amount of, you know, assets that all those clients combined had, Mr. Heil's portion was 14% of it. He's trying to take 50% of it. You know, Morgan Stanley paid him a large sum of money for the promise that he would bring 40% of it. He only had 14% of it, which he was free to take with him from day one. He is, again, you know, again, trying to capitalize on the goodwill that he developed with these individual investors. For the 10 years he was drawing a paycheck, not from LPL, from Sheffield. You know, he kept the $25,000. You know, he believes that contracts are a one-way document, that he's free to violate them, you know, at liberty, and that Merrill Lynch or Sheff Financial doesn't have the right to hold him up to his end of the bargain. Again, nothing about the preliminary injunction keeps him from working in the area, advertising in the area, developing new clients in the area, servicing any clients that sign up with him in the absence of an improper solicitation. We're not trying to deprive him of his ability to earn a career and earn a living. Again, it was a fair balance. Judge Crowder, I think, you know, she carefully considered all the arguments, carefully reviewed all the exhibits, carefully considered all the testimony and the demeanor of the witnesses, and reached, you know, a conclusion that certainly did not abuse any notion of discretion, certainly was not arbitrary or capricious, and we respectfully request, Your Honors, you know, affirm the preliminary injunction issued by Judge Crowder and remand the case back to Judge Crowder to reach the merits of all the arguments that Mr. Alonzo has raised and will continue to raise going forward. Thank you, Your Honors. See you, Bob. Good morning, Your Honors. May it please the Court, my name is Dan Worth. Along with Mr. Alonzo, I represent Stephen Heil as with Mr. Alonzo, I am admitted pro hoc. There's one, I think, really key issue here that we really have to look to. Who are the entities? The entities, Sheffield Financial Services Incorporated, the one who got the injunction, who filed this case, is a complete stranger to the securities industry, which is the industry which is at issue here. You know, there were some statements that Sheffield had affiliation with LPL. Sheffield Financial Services Incorporated, the plaintiff has no relationship with anybody as it relates to the brokerage industry. There's no contract between Sheffield Financial Services Incorporated and any LPL entities. There's no contract between Sheffield Financial Services Incorporated and any clients. And because it is an unregistered entity, and it could be a registered entity if it wanted to, they usually could have formed what's called a registered investment advisor, and it became that and then legally received revenue, but they have not. But because it has not done that, it is a stranger to the industry. And the more they try to claim that they have a legitimate business interest, and when I say they, I mean Sheffield Financial Services Incorporated, the entity, the more it tries to do that, the more it violates the securities law. And one thing that is missing from the briefing from Sheffield as well as our judiciary is any statement that there's any statutory basis, any case law, any financial industry rules saying that Sheffield Financial Services Inc., the entity, can receive securities-based compensation at all. That's because for them to receive the money related to these specific clients is illegal. In the trial court, did your expert agree that this is, though, a typical business model that's used in the financial planning industry? No, Your Honor. I believe that is a misrepresentation of what he said. On page 686 of the record in his transcript, he says, Clearly, Sheffield Financial Services, the entity, cannot receive directly or indirectly any remuneration related to these clients. Every cent that the clients pay goes to LPL, and then it goes to the LPL representative. It is illegal for that money to then go to Sheffield Financial Services Incorporated. There is a case that we cited, Your Honor, privately, the U.S. versus Dory, where individuals who are unregistered were receiving fees related to the securities business. And there were civil penalties, there were bars in the industry, there were ultimately criminal penalties. So there is no way that an unregistered entity can circumvent the registration requirements. And what we have here is just the unregistered entity, Sheffield. A really, really close analogy to what is happening here is in the SEC no-action letter, in the Herbert and Alder case, which is cited in our help brief. In that instance, there were non-individuals who were registered with a broker dealer, just as the individuals here are all registered with LPL. And those individuals wrote to the SEC and said, Would it or would it not violate the Exchange Act if we were to have the money come through a broker dealer to us, the financial advisors, and from us, the financial advisors, to this unregistered entity? And the SEC said, No, absolutely not, because they are not registered. They would violate the Exchange Act. And I think what was missing from Mr. Berry's description of how the money comes in is that it comes in from LPL, at least what they testify is it comes in from LPL, goes to the registered reps, and it goes from the registered reps to Sheffield Financial Services, and it's that step that is illegal in violation of the Exchange Act. And so because it's absolutely a panoply of revenue, it absolutely is not in the legitimate business interest. Now, there was also an attempt to draw a distinction between different models, and the independent model and what's called the Wattner-Globe-Wielding, the Wirehouse model. And there is no distinction as it relates to the exchange laws. They say the laws apply equally to the independent and the Wirehouse model, and that the SEC views them as employees even though they're independent reps, and that you can't circumvent the Exchange Act by calling somebody an independent contractor. It applies equally to everybody. So I think for those reasons, there was no basis, and the judge sort of ruled on the standing issue prior to issuing the injunction. The last issue, Your Honor, that you raised related to Mr. Isle voluntarily signing the agreement, the fact that it was represented to him that this was proper does not make the contractor compliance with the Exchange Act. It still remains out of compliance with the Exchange Act because it requires that revenue be shared with an unregistered entity. And so I thank you for your time today and your attention. I know it's a very long trial. Thank you, counsel. These will be taken under advise if you're excused. And we're going to take a big break. Recess right now. All rise.